638 F.2d 1300
 Willie Mae BYRD, As Administratrix of the Estate of Lawrence
Byrd, deceased, Plaintiff-Appellant-Cross Appellee,
v.
Heinrich Schmidt REEDEREI, Defendant-Appellee-Cross Appellant.
 No. 78-3064.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B
 March 12, 1981.
 Joel D. Eaton, Walter H. Beckham, Jr., Miami, Fla., Roger Vaughan, Wagner, Cunningham, Vaughan & Genders, Tampa, Fla., for plaintiff-appellant, cross-appellee.
 Fowler, White, Gillen, Boggs, Villareal & Banker, Nathaniel G. W. Pieper, Dewey R. Villareal Jr., Tampa, Fla., for defendant-appellee, cross-appellant.
 Appeals from the United States District Court for the Middle District of Florida.
 Before KRAVITCH and FRANK M. JOHNSON, Jr., Circuit Judges and ALLGOOD*, District Judge.
 KRAVITCH, Circuit Judge:
 
 
 1
 This action under the Longshoremen's and Harbor Workers' Compensation Act[1] arises from the death of Lawrence Byrd, a longshoreman killed while loading freight aboard a ship owned by appellee, Heinrich Schmidt Reederei. The jury found Reederei negligent and assessed total damages of appellant Willie Mae Byrd, Byrd's widow and the administratrix of his estate, at $125,000. The jury also found Byrd 50% at fault. The court rendered judgment for appellant Byrd in the amount of $62,500, half the damages assessed. Two issues confront us: 1) whether, as a matter of law under the Act (LHWCA) as amended in 1972, a longshoreman may be found contributorily negligent for failing to stop work after a shipowner has been notified of a dangerous condition and fails to remedy it;[2] and 2) whether a jury instruction not to consider inflation in calculating damages was erroneous. We conclude that the court improperly applied contributory negligence but did not err in its jury instruction regarding inflation; Johnson v. Penrod Drilling Co., 510 F.2d 234 (5th Cir. 1975) (en banc), prohibiting instructions contra, remains the law of this circuit. We affirm in part, reverse in part and remand with directions that the district court enter judgment for appellant in the full amount, $125,000, found by the jury.
 
 I.
 
 2
 The facts are not in dispute. Shortly after midnight on July 28, 1975, the German ship M/V ANTARES arrived at Port Manatee, Florida to be fully loaded with densely compacted old cardboard cartons (hereafter, "OCC"). Reederei, the vessel's owner, had retained as stevedore Eller & Co. to carry out the loading operations. Lawrence Byrd was one of several independent longshoremen Eller & Co. hired at the local union hall on the morning of July 28 to load the ship.
 
 
 3
 The stevedoring hierarchy, insofar as it is relevant, was as follows: Eller's "ship superintendent" Michael O'Kash was in charge. Below him were two "ship foremen," Willie Doby and Hugh Overton. Under the ship foremen were four "headers," each of whom was responsible for overseeing the loading of one of the ship's four holds, and the longshoring "gang" assigned to that hold. Rudy Logan was the "header" in charge of the number 3 hold; his gang consisted of nine men: two "landers" on the pier, who tied the bales of OCC to the crane-like cargo boom; a "winchman" operating the cargo boom on board the deck; a "flagman" directing the winchman; a forklift operator in the hold who placed the lowered bales into a stowed position; three "pullers" in the hold who detached the bales from the cargo boom's hook after they were lowered; and an additional longshoreman who rotated between the winch and forklift, freeing one man from work.
 
 
 4
 The bales of OCC, each measuring five feet by five feet by three and a half feet, tied with wire, and weighing approximately 1500 pounds, were thus lifted from the pier and lowered through the narrow opening in the top of each hold by the cargo boom, detached from the boom by the "pullers," and moved to the sides of the hold and stowed in stacks six high by the forklift operator. Eller & Co. selected this method of stowage.[3]
 
 
 5
 On July 28, Byrd, who had 22 years' experience as a longshoreman and was qualified to be a header, was hired as a puller and assigned to the number 3 hold. With him as pullers were Lucious Holden and William Avant. Holden had five years' experience as a longshoreman and Avant slightly less than that. With respect to complaints regarding working conditions, the stevedoring hierarchy was strictly enforced: "pullers" were to complain only to "headers" who in turn could speak only to the ship foremen who, with O'Kash, could complain directly to the vessel's crew. Anyone, however, could complain to the crew of very serious conditions.
 
 
 6
 The lines tying the ship to the pier descend from the ship to the pier. As the ship is loaded, riding lower in the water, they slacken,[4] allowing the ship to roll and creating the possibility that stacked freight can fall. (With slack lines, the ship rolls inshore each time a cargo boom lifts cargo from the pier.)[5] The lines must therefore be continually tightened during loading. The parties agree that tight lines and a stable ship are essential to safe loading and that on board the ANTARES these conditions were solely the responsibility of the ship's crew and not of the stevedore or of individual longshoremen, who were forbidden to touch the lines. The parties further agree that on July 28 the lines slackened throughout the day, the ship rolled considerably, and stevedore employees repeatedly complained of this condition to the ship's crew. Reederei also admits that although the ship's rolling and the complaints continued into the afternoon,[6] the crew tightened the lines only once, at approximately 10:15 a. m.
 
 
 7
 At 3:50 p. m., Byrd, Holden and Avant were in the number three hold with the forklift operator awaiting delivery of additional bales. The men stood on the offshore side of the hold in front of a number of bales which had already been stowed, since this was their safest location when the cargo boom brought the cargo in over the inshore side of the hatch. Without warning, several bales fell from the stacks in the offshore wing toward the center of the hold, striking the forklift and the three men. Two bales fell on Byrd, crushing his chest. He died approximately 25 minutes later. Holden and Avant were injured.
 
 
 8
 In her complaint, appellant alleged that the shipowner's negligence was a proximate cause of her husband's death. Holden and Avant brought like suits; the three were consolidated for trial. Reederei denied liability and alleged alternatively that the three men, having continued to work under conditions they knew to be dangerous, were contributorily negligent.[7] The court denied plaintiffs' motion for a directed verdict on the contributory negligence issue, stating that the evidence of plaintiffs' negligence "may be slight or nil" but that continuing to work under dangerous conditions after protesting to no avail "could arguably constitute negligence." Hence, it submitted the question to the jury. Over plaintiffs' objection, the court also charged the jury that they were not to increase any damages awarded to plaintiffs because of an expectation of future inflation. The jury found Reederei negligent, and Lawrence Byrd, Holden and Avant 50%, 20% and 10% at fault, respectively. It assessed appellant's damages at $125,000,[8] and the court entered judgment for her in the amount of $62,500. Willie Mae Byrd's motions for a new trial and for judgment notwithstanding the verdict were denied.
 
 
 9
 On appeal Byrd raises three issues: 1) that the trial court erroneously denied her motions for a directed verdict and for judgment notwithstanding the verdict on the issue of contributory negligence, instead submitting it to the jury, 2) alternatively, that the trial court erroneously denied her motion for new trial on the ground that the jury's assignment of three different percentages of fault to Byrd, Holden and Avant and its finding that Byrd was equally at fault with the shipowner for failing to stop work were irrational and against the manifest weight of the evidence, and 3) that the court erred in refusing to allow the jury to consider the effects of inflation in awarding damages.
 
 II.
 
 10
 Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969) (en banc) governs our review of motions for directed verdict. Unless there was "a conflict in substantial evidence," 411 F.2d at 375, the court improperly submitted the question to the jury. Appellant Byrd argues that there was no evidence favoring appellee on this issue, because holding a longshoreman contributorily negligent for failing to stop work after he has complained to no avail of dangerous working conditions is tantamount to holding that he assumed the risk, a now impermissible defense. Reederei counters that contributory negligence properly applies in this situation, especially under the 1972 amendments to the LHWCA. In this guise the issue is drawn; Reederei does not argue that Byrd (or his co-workers Holden and Avant) was negligent in any respect other than failing to stop work.
 
 
 11
 We first note that there is no question[9] that assumption of the risk is not a permissible defense to actions brought under the LHWCA, as was made clear in Gay v. Ocean Transport & Trading, Ltd., 546 F.2d 1233, 1238 (5th Cir. 1977):
 
 
 12
 (C)ertain common land-based principles of state law are not to be carried over into the federal law governing LHWCA suits. Assumption of risk may not be utilized as a defense....
 
 
 13
 Thus, our primary question is whether, as appellant claims, the trial court impermissibly applied the assumption of risk defense, albeit by another name contributory negligence or whether, as appellee contends, this is merely a factual inquiry to which contributory negligence properly applies.
 
 
 14
 In Schlemmer v. Buffalo, Rochester & Pittsburgh Railway Co., 205 U.S. 1, 27 S.Ct. 407, 51 L.Ed. 681 (1907), the Supreme Court faced a similar question. A railroad employee was killed while performing his job and the statute under which his administrator sued abrogated an assumption of the risk defense. Judgment was entered for the railroad on the ground that the decedent had been contributorily negligent. Justice Holmes thus addressed the same distinction we now consider:
 
 
 15
 (T)he risk is said to be assumed because a person who freely and voluntarily encounters it has only himself to thank if harm comes, on a general principle of our law. Probably the modification of this general principle by some judicial decisions and by statutes like § 8 (abrogating the defense) is due to an opinion that men who work with their hands have not always the freedom and equality of position assumed by the doctrine of laissez faire to exist.
 
 
 16
 Assumption of risk in this broad sense obviously shades into negligence as commonly understood. Negligence consists in conduct which common experience or the special knowledge of the actor shows to be so likely to produce the result complained of, under the circumstances known to the actor, that he is held answerable for that result, although it was not certain, intended, or foreseen. He is held to assume the risk upon the same ground.... (T)he practical difference of the two ideas is in the degree of their proximity to the particular harm. The preliminary conduct of getting into the dangerous employment or relation is said to be accompanied by assumption of the risk. The act more immediately leading to a specific accident is called negligent. But the difference between the two is one of degree rather than of kind; and when a statute exonerates a servant from the former, if at the same time it leaves the defense of contributory negligence still open to the master ..., then, unless great care be taken, the servant's rights will be sacrificed by simply charging him with assumption of the risk under another name.... We cannot help thinking that this has happened in the present case....
 
 
 17
 205 U.S. at 12-13, 27 S.Ct. at 409. Justice Holmes went on to state that the danger was so great and "inevitably and clearly attached to the risk which Schlemmer did not assume, that to enforce the statute (abrogating assumption of risk) requires that the judgment should be reversed." 205 U.S. at 14, 27 S.Ct. at 410.
 
 
 18
 Several circuits have applied the same logic to cases similar to the instant one brought under the LHWCA. Faced with parallel facts, in Rivera v. Rederi A/B Nordstjernan, 456 F.2d 970 (1st Cir.), cert. denied, 409 U.S. 876, 93 S.Ct. 124, 34 L.Ed.2d 128 (1972), the First Circuit held that appellant longshoremen could not be charged with contributory negligence for continuing to work, where they had complained of dangerous conditions and were told that the problem would be remedied and that they should return to work. "To say the plaintiffs were contributorily negligent in these circumstances would be to state that in continuing work they assumed the risk of obeying orders. We will not allow assumption of risk to masquerade as contributory negligence." 456 F.2d at 974. Similarly, the Second Circuit, under like circumstances in Rivera v. Farrell Lines, Inc., 474 F.2d 255 (2d Cir. 1973), cert. denied, 414 U.S. 822, 94 S.Ct. 122, 38 L.Ed.2d 55 (1974), reached the same conclusion. There, a messman brought suit against the shipowner for injuries he had suffered from falling on a wet pantry floor covered with soapy water as a result of defective drains. He had continually but unsuccessfully complained of this condition to the ship's officers. The shipowner defended on the ground that the messman's continuing to work in the light of such known dangers constituted contributory negligence, and the jury so found. The Second Circuit responded:
 
 
 19
 The distinction between assumption of risk and contributory negligence is well established. In common law days the knowledgeable acceptance by an employee of a dangerous condition when and if such acceptance was necessary for the performance of his duties was assumption of risk.... Contributory negligence, on the other hand, connotes some careless act or omission on the part of the employee over and above that knowledgeable acceptance.... As the defense of assumption of risk has been abolished by statute ... the first issue before us is whether the charge permitted assumption of risk to go to the jury in the guise of contributory negligence.
 
 
 20
 The only theory of contributory negligence the record reveals ... was the argument that appellant was careless in moving in and about the pantry, knowing the sloppy condition of the floors. This theory, however, was really assumption of risk masquerading under another name, because it allowed a finding of contributory negligence on the strength of appellant's knowledge that a dangerous condition in his line of duty existed and his working in that line of duty.... Thus the verdict must be set aside....
 
 
 21
 474 F.2d at 257-58.
 
 
 22
 The Fourth Circuit, also, has concluded that holding an employee contributorily negligent because he knew of a dangerous condition and yet continued to work impermissibly charged him with assumption of the risk. In Sessler v. Allied Towing Corp., 538 F.2d 630 (4th Cir. 1976), a barge employee used a "non-explosion proof" pump to remove gasoline from the barge, and an explosion occurred. The court held that the district court's finding of contributory negligence on the part of Sessler was "tantamount to holding Sessler negligent because he realized his job was dangerous but did it anyway. Since the (non-explosion proof) pump was the only pump available for his work, he could avoid using it only by refusing to do the job.... Viewed in this light, Sessler's conduct is properly characterized as assumption of risk, not contributory negligence." 538 F.2d at 632. Earlier, in Smith v. United States, 336 F.2d 165 (4th Cir. 1964), the fact that the injured longshoreman had known the ladder he used to exit a hold was defective was held not to render him contributorily negligent; to do so would charge him with " 'assumption of the risk under another name.' " 336 F.2d at 168. Only if there had been a safe alternative route available to Smith could his choice of the known-to-be unsafe ladder "possibly have indicated contributory fault."
 
 
 23
 Our decisions, while they do not parallel as closely the facts before us, are in accord. In San Pedro Compania Armadoras, S. A. v. Yannacopoulos, 357 F.2d 737 (5th Cir. 1966),[10] a seaman was ordered to climb into a tank that had a defective top. The top fell crushing his hand. Setting aside the district court's finding that Yannacopoulos was 50% contributorily negligent, we wrote:
 
 
 24
 Since he had no choice but to use (the tank top) as it was, he cannot be made to assume the risk of injury when using the unseaworthy appliance in the regular discharge of his duties .... To do so would permit the rejected doctrine of assumption of risk to be applied under the label of contributory negligence.
 
 
 25
 357 F.2d at 741. In Brock v. Coral Drilling, Inc., 477 F.2d 211 (5th Cir. 1973), we affirmed the trial court's holding that Brock had not been contributorily negligent for following orders to unload cargo after he had complained of the hazardous conditions present. In doing so, we recognized that "Brock's decision must be evaluated in light of his economic dependence on Coral for future employment." 477 F.2d at 215. In Webb v. Dresser Industries, 536 F.2d 603 (5th Cir. 1976) a seaman sent ashore to Alaska to pick up supplies requested appropriate boots for the errand, was refused, and while ashore, slipped on the ice and was injured. The trial court made no finding regarding contributory negligence, and we remanded for consideration of that issue because Webb might have been able to obtain boots on his own. In doing so, however, we noted:
 
 
 26
 (T)he aperture for finding comparative fault on this basis (failing to minimize present dangers) is very narrow the rule is confined to instances where there has been generous opportunities safely to correct the known dangerous situation, and a heavy burden of proof rests with the defendant. (footnote omitted)[11]
 
 
 27
 536 F.2d at 609. Our review of these cases convinces us that Byrd does not fit within this narrow aperture. He had no opportunity to minimize the dangers caused by the ANTARES' rolling other than to stop work. In our judgment, holding him contributorily negligent for failing to do so, impermissibly charges him with assumption of the risk.[12]
 
 
 28
 Appellee asserts, however, that Mazzanti v. Lykes Bros. Steamship Co., Inc., 524 F.2d 961 (5th Cir. 1975), the only case upon which the district court relied in submitting the question of appellant's contributory negligence to the jury, is contra and controls. We disagree. Mazzanti, a longshoreman, was injured when he slipped and fell upon trash that had accumulated on the deck area. The district court found Mazzanti 75% contributorily negligent "because (he) should have reported the condition of the area to the gang foreman who could have requested that the area be cleaned by a cleanup crew or could have requested that aid be sent to the longshoremen's gang to assist them in cleaning the area." 524 F.2d at 962. After analyzing the ship's and Mazzanti's varying opportunities to correct the dangerous condition and concluding that the ship's crew was better able to do so than appellant, we directed that Mazzanti's contributory negligence be reduced to 50%. We also stated: "The alternatives available to (Mazzanti) in lieu of continuing work at the risk of harm to himself were to refuse to work or to report the condition and hope that cleanup assistance would be sent." (footnote omitted) Id. We conclude that Mazzanti does not control because of a critical factual difference between that case and the instant: Mazzanti had not reported the dangerous condition in order that it be corrected.[13] Here, longshoremen complained repeatedly.[14]
 
 
 29
 Appellee next argues that the above-cited cases (other than Mazzanti) are inapposite in that they either concern seamen, as opposed to longshoremen, or that they predate the 1972 Amendments to the LHWCA and thus no longer apply. Although the 1972 Amendments to the Act effected several fundamental changes in the nature of longshoremen's compensation,[15] those changes did not alter the impermissibility of the assumption of risk defense. Gay v. Ocean Transport & Trading, Ltd., supra.[16] Gay also makes clear that under the amendments, seamen and longshoremen are to be treated alike for these purposes. Thus, we pointed to the House of Representatives Committee Report which stated:
 
 
 30
 (T)he Committee intends that the admiralty concept of comparative negligence (governing seamen), rather than the common law rule as to contributory negligence, shall apply in cases where the injured employee's own negligence may have contributed to causing the injury. Also, the Committee intends that the admiralty rule which precludes the defense of "assumption of risk" in an action by an injured employee shall also be applicable. (footnote omitted)
 
 
 31
 546 F.2d at 1237.
 
 
 32
 Moreover, the Act is to be liberally construed to promote its compensatory purpose in favor of the injured employee. Alabama Dry Dock & Shipbuilding Co. v. Kininess, 554 F.2d 176 (5th Cir. 1977), cert. denied, 439 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 190 (1978); Smith v. M/V Captain Fred, 546 F.2d 119 (5th Cir. 1977). See also United States v. Bender Welding & Mach. Co., 558 F.2d 761 (5th Cir. 1977). This reinforces the conclusion that the cases cited supra, prohibiting application of the "assumption of risk" doctrine under the rubric of contributory negligence, properly apply.[17]
 
 
 33
 We conclude that the trial court erred in denying appellant's motion for directed verdict on the issue of contributory negligence and in reducing appellant's award of damages by 50%, the proportion of negligence the jury attributed to Byrd. Hence, we need not reach appellant's second argument, that the assignment of different percentages of contributory fault to the three longshoremen was irrational, or that Byrd could not, for not refusing to work, be charged with negligence equal to that of Reederei.
 
 III.
 
 34
 Appellant also challenges the instruction that the jury exclude inflation from its damage calculations.[18] Six years ago, in Johnson v. Penrod Drilling Co., supra, we squarely faced this question and held that juries should not be instructed to consider "future inflationary or deflationary trends in computing future lost earnings." 510 F.2d at 241. That decision has been criticized by members of our own bench.[19] It is also inconsistent with the decisions of the majority of other circuits that have addressed the question without reference to state law[20] and with the holdings of the state courts, with one exception, in our jurisdiction.[21] In addition, commentators generally have disfavored Penrod 's result.[22] Nonetheless, as Judge Wisdom stated in Davis v. Hill Engineering, Inc., 549 F.2d 314, 332 (5th Cir. 1977), "(u)ntil Penrod is overruled ... an inflation element cannot be included in damage computations." Thus, we decline to discuss the merits of the controversy and instead address the sole question before us: has Penrod been overruled?
 
 
 35
 An en banc decision of our court may be overruled only by subsequent en banc consideration or by the United States Supreme Court. No en banc court has again addressed this question, but last year in Norfolk Western Railway v. Liepelt, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), the Supreme Court held that the effect of income taxes could be considered in determining damage awards.[23] Responding to the argument that the future prediction of tax consequences is "too speculative and complex for a jury's deliberations," the Court stated:
 
 
 36
 Admittedly there are many variables that may affect the amount of a wage earner's future income tax liability .... But future employment itself, future health, future personal expenditures, future interest rates and future inflation are also matters of estimate and prediction .... (T)he practical wisdom of the trial bar and the trial bench has developed effective methods of presenting the essential elements of an expert calculation in a form that is understandable by juries that are increasingly familiar with the complexities of modern life. We therefore reject the notion that the introduction of evidence describing a decedent's estimated after-tax earnings is too speculative or complex for a jury. (footnote omitted; emphasis supplied)
 
 
 37
 444 U.S. at 494, 100 S.Ct. at 758. The Second Circuit recently pointed to this language as indicating the Supreme Court's approval of the consideration of inflation in damage awards and held that inflation could be so considered. Doca v. Marina Mercante Nicaraguense, S. A., 634 F.2d 30 (2d Cir. 1980). However, no Second Circuit decision contra bound the Doca panel;[24] it reached its conclusion only after reviewing decisions of other courts, its prior decisions regarding the consideration of inflation in assessing damages,[25] and the merits of the controversy. It did not hold that Liepelt compelled its result. We are not similarly free, and we agree that Liepelt 's favorable dicta is only that. Thus, until the Supreme Court speaks more directly or we, as an en banc court decide otherwise, Penrod still applies: the district court did not err in instructing the jury not to consider the effects of inflation in assessing Byrd's damages.
 
 
 38
 Accordingly, we affirm in part and reverse in part. We vacate the judgment and remand to the trial court to enter judgment for appellant in the full amount, $125,000, assessed by the jury.
 
 
 
 *
 District Judge of the Northern District of Alabama, sitting by designation
 
 
 [1]
 33 U.S.C. § 901 et seq
 
 
 [2]
 Reederei does not appeal the issue of liability
 
 
 [3]
 A fine for violating OSHA regulations in utilizing this method was later imposed against the stevedoring company, but Eller's liability is not at issue in this action
 
 
 [4]
 This process could be offset by a rising tide, just as a lowering tide would increase the slackness, but the ship's captain testified at deposition that there was not a wide range in tide at the time; hence, any effect from the tide was negligible
 
 
 [5]
 Each cargo boom picked up two bales, or 3,000 pounds, at a time. There were four cargo booms which, the testimony indicates, operated concurrently. Hence, a 12,000 pound (six ton) weight would list the ship shoreward
 
 
 [6]
 Ship foreman Doby testified that he was told the lines would be tightened during lunch, but they were not, and that he complained again three times after returning from lunch at 1:00 p. m. and before the accident. His last complaint was made 45 minutes before the accident occurred
 In addition, Holden testified that he complained to members of the crew at approximately 2 p. m., and Avant testified that he had made similar complaints at approximately 3 p. m.
 
 
 [7]
 The majority of cases use the term "contributory," meaning "comparative," negligence. To avoid confusion, we will here employ the term "contributory negligence."
 
 
 [8]
 It assessed Willie Mae Byrd's individual damages at $100,000, those of Lawrence Byrd's estate at $25,000
 
 
 [9]
 Reederei does not contend otherwise
 
 
 [10]
 That San Pedro preceded the 1972 Amendments to the LHWCA does not alter its significance here. See discussion infra
 
 
 [11]
 The court properly spoke of comparative negligence
 
 
 [12]
 The record shows (and appellee does not contend otherwise) that none other than the ship's crew was permitted to handle the ship's lines, nor did longshoremen have any responsibility for the plan of stowage
 
 
 [13]
 Because Mazzanti had not complained the basis for the court's finding of contributory negligence the court's language regarding his alternative of refusing to work is dicta
 
 
 [14]
 In Mazzanti, we also noted that appellant might have cleaned the area himself although the trial court made no findings of fact as to whether he was under a duty to do so. Whether or not he was under such duty, however, if he had complained unsuccessfully this might have been the best alternative means of minimizing the danger to himself, unless he was prohibited from doing so. Compare Webb, supra. The latter, of course, was the case with Byrd
 
 
 [15]
 For a comprehensive discussion of these alterations, see Robertson, Negligence Actions by Longshoremen Against Shipowners under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act, 7 J.Mar.L. & Com. 447 (1976)
 
 
 [16]
 We noted that although "LHWCA negligence law is (now) to be guided primarily by analogy to land-based law concepts ... (a)ssumption of risk may not be utilized as a defense." (footnote omitted) 546 F.2d at 1237-38
 
 
 [17]
 Reederei also argues that Byrd's contributory negligence is a question of fact not law (and thus properly submitted to the jury) because longshoremen working aboard the ANTARES knew they could stop work under dangerous conditions. Accepting this argument, however, would impose upon individual longshoremen the risk of correctly deciding when conditions were sufficiently dangerous and when enough others agreed. (Testimony at trial indicated an individual longshoreman could not bring about a work stoppage.) Not only would the longshoreman risk a loss of wages for the period he stopped work, but also a loss of future employment. See Brock v. Coral Drilling, supra. We believe the Act did not intend that consequence
 
 
 [18]
 Neither party's requested jury instructions referred to the permissibility of the jury considering the impact of inflation on any damage award to plaintiff. However, the court instructed the jury:
 In considering any loss of future income or future estate or future support and services, and of ability to earn money in the future, you are not to increase any such amounts based upon any estimated rate of future inflation; (you) should ascertain the present worth in dollars of such future damages and award only that amount.
 
 
 [19]
 See Freeport Sulphur Co. v. S/S Hermosa, 526 F.2d 300 (5th Cir. 1976) (Wisdom, J., specially concurring); Higginbotham v. Mobil Oil Corp., 545 F.2d 422 (5th Cir. 1977) (Godbold, J., concurring in part and dissenting in part), reversed on other grounds, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978); Davis v. Hill Engineering, Inc., 549 F.2d 314 (5th Cir. 1977)
 
 
 [20]
 Doca v. Marina Mercante Nicaraguense, S. A., 634 F.2d 30 (2d Cir. 1980) (LHWCA suit); Bach v. Penn Central Transportation Co., 502 F.2d 1112 (6th Cir. 1974) (Federal Employers' Liability Act (FELA) suit); Taenzler v. Burlington, 608 F.2d 796 (8th Cir. 1979) (FELA suit); United States v. English, 521 F.2d 63 (9th Cir. 1975) (Federal Tort Claims Act suit); Steckler v. United States, 549 F.2d 1375 (10th Cir. 1977) (Federal Tort Claims Act suit). But see Williams v. United States, 435 F.2d 804 (1st Cir. 1970); Magill v. Westinghouse Electric Corp., 464 F.2d 294 (3rd Cir. 1972)
 
 
 [21]
 Bearden v. Le Master, 248 Ala. 588, 226 So.2d 647 (1969) (not error to instruct jury to consider inflation in damage award); Seaboard Coast Line R. R. Co. v. Garrison, 336 So.2d 423 (Fla.2d D.C.A.1976) (permissible for jury to consider inflation and to hear expert testimony on rate of inflation); Woods v. Andersen, 145 Ga.App. 492, 243 S.E.2d 748 (1978) (expert testimony regarding rate of future inflation admissible); Murphy v. Georgia-Pacific Corp., 628 F.2d 862 (5th Cir. 1980) (Louisiana law holds evidence of inflation admissible); Weakley v. Fischbach & Moore, Inc., 515 F.2d 1260 (5th Cir. 1975) (interpreting Texas law: not error to permit jury to consider evidence of future inflation). Mississippi is the exception. See Atwood v. Lever, 274 So.2d 146 (1973) (jury instruction to consider decreased purchasing power of dollar and increased costs of living, matters aliunde of record, error)
 
 
 [22]
 See, e. g., Kane, "Inflation, tight money, and Penrod : the cost of judicial error," Texas Trial Lawyers Forum, April-June, 1980 (noting that, since increased inflation raises interest rates thereby reducing the present value of future loss, Penrod, instructing fact finders to discount to present value and not to consider inflation, doubly penalizes plaintiffs). See also Dennis, Sirmon & Drinkwater, "Wrongful Death Damages," 47 Miss.L.J. 173 (1976); Formizess & O'Donnell, "Inflation and the Valuation of Future Economic Losses," 38 Mont.L.Rev. 297 (1977); Henderson, "The Consideration of Increased Productivity and the Discounting of Future Earnings to Present Value," 20 S.D.L.Rev. 307 (1975); Hopkins, "Economics and Impaired Earning Capacity in Personal Injury Cases," 44 Wash.L.Rev. 351 (1969); Note, "Future Inflation, Prospective Damages, and the Circuit Courts," 63 Va.L.Rev. 105 (1977)
 
 
 [23]
 We applied this aspect of Liepelt in Lang v. Texas & P. Ry. Co., 624 F.2d 1275 (5th Cir. 1980)
 
 
 [24]
 The panel noted: "In this Circuit, the issue has been considered but not resolved." 634 F.2d at 35
 
 
 [25]
 The court cited, inter alia, Feldman v. Allegheny Airlines, Inc., 524 F.2d 384 (2d Cir. 1975), which approved use by the lower court of an "inflation-adjusted discount rate," where Connecticut state law governed and afforded such latitude, and the judge relied upon "the historical and other economic evidence." 524 F.2d at 388. The Feldman court did not squarely decide, therefore, the propriety of such jury instructions as a matter of federal law