644 F.2d 460
 Ruth CULVER et al., Plaintiffs-Appellants Cross-Appellees,
v.
SLATER BOAT COMPANY et al., Defendants-Appellees Cross-Appellants,
EURO-PIRATES INTERNATIONAL, INC., et al.,
Defendants-Appellees and Cross- Appellees-Appellants,
v.
ODECO DRILLING et al., Defendants-Appellees Cross-Appellants.
 No. 79-3985.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit A
 May 4, 1981.
Rehearing En Banc Granted June 24, 1981.
 W. James Kronzer, W. W. Watkins, Houston, Tex., Frederick J. Gisevius, Jr., New Orleans, La., for plaintiffs-appellants cross-appellees.
 Richmond M. Eustis, New Orleans, La., for Slater Enterprises, Europirates, etc.
 Drury, Lozes & Curry, Felicien P. Lozes, New Orleans, La., for Gulf Overseas Ser. Corp.
 J. Walter Ward, New Orleans, La., for Ocean Drilling.
 Mat M. Gray, III, New Orleans, La., for St. Paul Fire.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before AINSWORTH and SAM D. JOHNSON, Circuit Judges, and HUNTER*, District Judge.
 AINSWORTH, Circuit Judge:
 
 
 1
 This maritime personal injury case raises several issues, including the use of an inflation factor to compute future loss of earnings, the construction of jury instructions and interrogatories, and the rights to indemnity between actively and passively negligent tortfeasors. The district court's disposition of the indemnity issue requires a slight modification; in all other respects we affirm the district court.
 
 I. FACTS
 
 2
 Curtis Culver, the husband and father of plaintiffs-appellants, was the foreman of an anchor-pulling crew employed by Gulf Overseas Marine Corporation (Gulf). Shell Oil Company (Shell) contracted with Gulf to provide an anchor-pulling crew to assist in moving the drilling barge OCEAN QUEEN to a new location off the Louisiana coast in the Gulf of Mexico. In their anchor-pulling operations, the Gulf crew used the vessel M/V BLACK BART which was owned by Charles D. Slater d/b/a Slater Boat Company and leased under a bareboat charter to Euro-Pirates International, Inc. (collectively EPI). The OCEAN QUEEN was owned and maintained by Ocean Drilling & Exploration Company (ODECO). Essentially, the Gulf crew's job was to use the machinery on the BLACK BART to lift the anchors of the OCEAN QUEEN out of the seabed, to float the drilling barge to its new location, and to anchor it again there. To get control of the anchor line, the Gulf crew, under the direction of foreman Culver, first "lassoed" a buoy attached to the anchor line and brought the buoy aboard the BLACK BART. Then, a set of unusual circumstances combined to produce the unfortunate accident which gives rise to this lawsuit. The anchor line was too short, and the BLACK BART drifted away from the OCEAN QUEEN; thus, the cable "lasso" was holding not only the weight of the line but also the weight of the anchor. The taut cable "lasso" raked across a jagged surface of the buoy and severed. As the buoy raced back over the deck of the BLACK BART and into the water, it struck Culver who had left his position of safety at the stern of the vessel to inspect the line. Culver died from his resulting injuries.
 
 
 3
 Culver's widow and children sued Shell, Gulf, EPI, and ODECO under the Jones Act, 46 U.S.C. § 688, the Death on the High Seas Act, 46 U.S.C. § 761 et seq., maritime tort, and negligence. Shell was dismissed as a party defendant. The remaining defendants filed appropriate cross-claims. A jury found all the remaining three defendants negligent, the BLACK BART unseaworthy and Culver free from contributory negligence. As between the defendants, on their cross-claims for indemnity, the district court found each actively negligent and not entitled to indemnity from either of the other two. The judge held that Gulf was negligent because its employee, Curtis Culver, failed to remain in his position of safety away from the anchor line. However, the district judge did not disturb the jury's finding of no negligence[1] on the part of Culver in the main action.
 
 
 4
 In determining the damages sustained by the Culvers for the death of Curtis, the district judge allowed testimony concerning discount rates and the earning power of money invested in low risk bonds. The judge instructed the jury to "discount the total amount" of any award for loss of future services or support by a percentage that represents an appropriate rate of interest.[2] The interrogatory submitted to the jury[3] was returned with a discount rate of 25% filled in. The judge decided that obviously the jury had misunderstood, and he substituted the only other rate put into evidence, 9.125%.[4] The total award after discounting was $238,861.05. The district judge did not allow testimony, charges, or interrogatories to be submitted on the effects of inflation on any damage award, citing Johnson v. Penrod Drilling Co., 510 F.2d 234 (5th Cir.), cert. denied, 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 (1975), as his reason therefor.
 
 II. INFLATION FACTORS
 
 5
 The Culvers' principal contention is that this circuit's en banc decision in Johnson v. Penrod Drilling Co., supra, relating to the use of an inflation factor to compute future loss of earnings, has been overruled either by changed circumstances or by the Supreme Court's decision in Norfolk and Western Railway Co. v. Liepelt, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980). In Penrod, we held that "the influence on future damages of possible inflation or deflation is too speculative a matter for judicial determination." 510 F.2d at 241. Therefore, "triers of the facts should not be instructed to take into account future inflationary or deflationary trends in computing lost earnings." Id. The Culvers argue that the extremely high rates of inflation this country has experienced in recent years make the Penrod rule an unjust anachronism and that in any case, Liepelt has overruled Penrod.
 
 
 6
 In Liepelt, the Supreme Court responded to an argument that future prediction of tax consequences is "too speculative and complex for a jury's deliberations":
 
 
 7
 Admittedly there are many variables that may affect the amount of a wage earner's future income tax liability. The law may change, his family may increase or decrease in size, his spouse's earnings may affect his tax bracket, and extra income or unforeseen deductions may become available. But future employment itself, future health, future personal expenditures, future interest rates, and future inflation are also matters of estimate and prediction. Any one of these issues might provide the basis for protracted expert testimony and debate. But the practical wisdom of the trial bar and the trial bench has developed effective methods of presenting the essential elements of an expert calculation in a form that is understandable by juries that are increasingly familiar with the complexities of modern life. We therefore reject the notion that the introduction of evidence describing a decedent's estimated after-tax earnings is too speculative or complex for a jury.
 
 
 8
 444 U.S. at 494, 100 S.Ct. at 758.
 
 
 9
 Our recent decision from Unit B of the Fifth Circuit in Byrd v. Reederei, 638 F.2d 1300 (5th Cir. 1981), specifically addresses the continued vitality of Penrod and is dispositive of the issue here before us. In Byrd, we noted first that "(a)n en banc decision of our court may be overruled only by subsequent en banc consideration or by the United States Supreme Court." Id. at 1308. Byrd then considered the argument for admitting inflation factors in light of Liepelt. "Liepelt 's favorable dicta is only that. Thus, until the Supreme Court speaks more directly or we, as an en banc court, decide otherwise, Penrod still applies ...." 638 F.2d at 1308. We are in agreement with Byrd 's disposition of the Liepelt issue.
 
 III. INCOME INCREASES
 
 10
 The Culvers next object to the district judge's not allowing them to argue to the jury that Curtis Culver's wages would increase over time and that the jury should take this into account in its award of future support. As we read the record, the district judge refused to permit the Culvers to argue such increases for two reasons. First, the Culvers offered no evidence to show that such an argument was warranted.[5] Curtis Culver's tax returns for the preceding five years showed that his income was level, not increasing, and Culver had reached the top of his particular line of work. Plaintiffs' counsel's attempt to prove increases were not sufficiently relevant to Culver's particular circumstances.[6] Second, the trial judge stated that possible job promotions and merit wage increases were merely an indirect way of putting inflation factors into evidence before the jury and were thus not allowed under Penrod. We find no error in the trial judge's rulings concerning wage increases.[7]
 
 IV. DISCOUNT RATE
 
 11
 The Culvers also object to the district judge's substitution of 9.125% for 25% as the discount rate to be applied to the jury's award. The Culvers argue either that a rate of 25% per year is manifestly unjust and does not conform to the evidence, thereby entitling them to a new trial, or, alternatively, that the jury's application of a 25% total discount cannot be disregarded and replaced by a yearly rate put into evidence by a defense witness. We recognize that the jury instruction and the interrogatory concerning the discount rate were subject to either a "total" or a "per year" interpretation.[8] However, it is clear to us that the parties and the court intended, and the law requires,[9] a per year rate. A 25% lump sum reduction in the award is not a rate. The trial judge was faced with a situation where applying a 25% per year discount would have been unjustly harsh and applying a 25% reduction would have been contrary to the law. The Culvers chose not to put evidence of a discount rate into the record. Although they had an economist on their witness list, they did not call him to testify. Adopting the rate suggested by the defendants' expert was a proper exercise of the district judge's discretion.
 
 V. APPORTIONMENT OF DAMAGES
 
 12
 The Culvers' final contention is that the case should be remanded for the trial court's failure to submit interrogatories to the jury which would have separated each plaintiff's award from those of the other four. The argument is without merit. The conflicting interests of the individual plaintiffs in a separated award, and the fact that the suit was brought by Curtis' wife for herself and as representative of the children, make this federal maritime suit the improper vehicle to apportion the award. Any separation is better left to the state court which appointed Mrs. Culver representative of her children. Moreover, the record contains no evidence on which the jury could have based its apportionment.
 
 VI. DEFENSES AND CROSS-CLAIMS
 
 13
 In its answers to interrogatories, the jury held all defendants negligent and also determined that Curtis Culver was free from contributory negligence. Stating that his disposition of the cross-claims was "in conformity with the verdict of the jury," the district judge found all defendants were actively negligent and apportioned the damages equally between them.
 
 
 14
 All defendants first contend that the jury's determination that they were negligent is without evidentiary support. We disagree. Evidence in the record, as outlined in Section I, supra, is sufficient and adequate to support the jury's verdict. See Fairley v. American Hoist & Derrick Co., 640 F.2d 679 at 680-681 (5th Cir. 1981); Nunez v. Superior Oil Co., 572 F.2d 1119, 1124 n.6 (5th Cir. 1978); Manchack v. S. S. Overseas Progress, 524 F.2d 918, 919 (5th Cir. 1975). Next, each defendant cross-claims against its codefendants and asserts that the district judge's findings of active negligence as to it are erroneous, that it was only passively negligent, and is therefore entitled to indemnity from its codefendants. EPI's and ODECO's claims in this regard are without merit. The failure of EPI's crew on the BLACK BART to keep a proper lookout and its allowing the vessel to drift were substantial causes of Culver's ultimate injury; therefore, EPI's negligence was active. See Chesapeake & Ohio Railway v. Illinois Central Gulf Railroad, 564 F.2d 222, 224 (7th Cir. 1977), cert. denied, 435 U.S. 919, 98 S.Ct. 1515, 55 L.Ed.2d 535 (1978). Likewise, ODECO's use of an anchor line that was too short and the failure to maintain its buoy amounted to active negligence.
 
 
 15
 Gulf's claim that it was only passively negligent requires more extended discussion. In the indemnity phase of the case, the district judge found Gulf actively negligent based on the failure of its employee, Curtis Culver, to stay in a position of safety at the stern of the vessel; yet, the jury found Culver free from negligence. These findings are obviously inconsistent. The judge followed the jury's findings in all other respects. Under the circumstances, the jury determination will prevail.
 
 
 16
 Although the jury exonerated Culver of negligence, it nevertheless found that Gulf was negligent. Gulf contends that the jury's determination can be based only on Gulf's failure to provide a safe place to work under the Jones Act, 46 U.S.C. § 688[10] and that such a failure is merely passive or technical negligence. Accordingly, Gulf argues that the district court, consistent with the jury's answers to interrogatories, should have held that Gulf is entitled to indemnity from the active tortfeasors ODECO and EPI. Tri-State Oil Tool Industries, Inc. v. Delta Marine Drilling Co., 410 F.2d 178, 181 (5th Cir. 1969). We need not decide here whether mere failure to provide a safe place to work is active or passive negligence. But see Wedlock v. Gulf Mississippi Marine Corp., 554 F.2d 240, 243 (5th Cir. 1977) and Avondale Shipyards, Inc. v. The Vessel THOMAS E. CUFFE, 434 F.Supp. 920, 928 (E.D.La.1977) (Rubin, J.) (both cases suggesting that liability without fault for unseaworthiness is the only instance where indemnity should be allowed). Where a tortfeasor's own acts and omissions help create the unsafe workplace, its negligence undoubtedly is active. Wedlock v. Gulf Mississippi Marine Corp., supra at 243; Transcontinental Pipeline Corp. v. Mobile Drilling Barge, 424 F.2d 684, 693 (5th Cir.), cert. denied, 400 U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64 (1970); General Electric Co. v. Cuban-American Nickel Co., 396 F.2d 89, 99 n.16 (5th Cir. 1968); Avondale Shipyards, Inc. v. The Vessel THOMAS E. CUFFE, supra at 928. The jury heard evidence during the trial that Gulf's anchor-pulling crew failed to notice the jagged buoy, that the crew failed to ask that additional anchor line be added before lassoing the buoy, that its anchor box used in lifting the anchor may have been defective, and that the cable lasso may have been the wrong gauge or strength for performing the operation. From the general nature of the jury's response to the interrogatory concerning Gulf's negligence,[11] it is impossible for us to say that its finding of negligence was not based on one or more of these theories. Any one of these would constitute active negligence. Therefore, Gulf's claim for indemnity must likewise be denied.
 
 
 17
 Finally, ODECO's claim for a reduction in the damage award based on the judge's finding of comparative negligence on the part of Curtis Culver is unsupportable since we are modifying that portion of the district court judgment.
 
 The judgment is
 
 18
 AFFIRMED AS MODIFIED.
 
 SAM D. JOHNSON, Circuit Judge, concurring:
 
 19
 This writer concurs in the majority opinion, but wishes to supplement it in one particular: The time is right for en banc reconsideration of the rule in Johnson v. Penrod Drilling Co., 510 F.2d 234 (5th Cir. 1975) (en banc), pertaining to the "inflation factor" in damages awards.
 
 
 20
 The en banc precedent of Penrod does indeed mandate the result that this panel reaches. Immediate en banc rehearing of the instant case is therefore urged as the appropriate route toward the proper disposition of this critically important issue.
 
 ON REHEARING AND REHEARING EN BANC
 
 21
 Before GODBOLD, Chief Judge, BROWN, AINSWORTH, CHARLES CLARK, RONEY, GEE TJOFLAT, HILL, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, JR., GARZA, HENERSON, REAVLEY, POLITZ, THOMAS A. CLARK, and WILLIAMS, Circuit Judges.
 
 BY THE COURT:
 
 22
 A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,
 
 
 23
 IT IS ORDERED that the cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.
 
 
 
 *
 District Judge of the Western District of Louisiana, sitting by designation
 
 
 [1]
 The jury interrogatory concerning Curtis Culver's negligence reads as follows:
 R. vol. 3 at 629.
 
 
 [2]
 The district judge instructed the jury:
 Therefore if you find that any of the Culvers will sustain a loss of support and/or services in the future, the amount is to be reduced, that is you should discount the total amount that you think will be lost by a percentage that you feel represents an appropriate rate of interest at the present time in the New Orleans area.
 R. vol. 8 at 858.
 
 
 [3]
 The interrogatory reads as follows:
 f. If you have made any award to plaintiffs for loss of support and/or services in the future (parts b, c, and d of this question), what discount percentage rate do you find to be applicable in order to reduce the award for future loss of support and/or services to their present value. (Your answer to this question should be in the form of a percentage.)
 twenty-five percent
 R. vol. 3 at 631.
 
 
 [4]
 Defendant ODECO's expert witness in the field of bond investments, Mr. Donald Hattier, an investment banker with E. F. Hutton, testified that an investor could purchase U. S. government bonds with a coupon rate of 9.125% in denominations of $1,000 with a maturity date in the year 2009 (Culver's normal work-life expectancy). R. vol. 7 at 735. At the time of trial the bonds were selling at a slight discount which the district judge chose to ignore. Mr. Hattier testified further that government bonds were the safest in the marketplace
 
 
 [5]
 The district judge did allow the Culvers' witness to testify to increases in the hourly wage for anchor-pulling crew foremen from $4.75 in 1975 to $6.50 in 1978 and $6.96 on the date of trial in 1979. R. vol. 6 at 276. The judge explained a formula to the Culvers' attorney by which Curtis Culver's hypothetical 1978 and 1979 salaries could be estimated, id. at 279, but counsel chose not to use that formula. By using the formula, Culver's earnings would have been approximately.$19,000 per year in 1979. R. vol. 8 at 766. Instead counsel stated that he wished to argue, without any apparent evidentiary support, Culver's earnings would be $35,000 per year. Id
 
 
 [6]
 Counsel attempted to establish Culver's hypothetical 1978 earnings, a year for which counsel had adduced an exact hourly wage, by reference to the earnings of other foremen working for other companies. Counsel did not use Culver's personal work history to establish earnings
 
 
 [7]
 The district judge did permit the jury to consider provable increases in the wage of Gulf anchor-pulling foremen up to the time of trial in determining future earnings. However, the jury was apparently unimpressed with any of the arguments relating to wage increases. It chose instead to fix damages at the approximate average earnings that Culver had reported on his income tax statements for the five years prior to his death
 
 
 [8]
 See notes 2 and 3 supra
 
 
 [9]
 Chesapeake & O. Ry. v. Kelly, 241 U.S. 485, 490-91, 36 S.Ct. 630, 632, 60 L.Ed. 1117 (1916)
 
 
 [10]
 Section 688 of the Jones Act provides:
 Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.
 
 
 [11]
 The jury interrogatory and answer read as follows: