**Glen Austin BROWN**

v.

**PENROD DRILLING COMPANY.**

**Civ. A. No. 80–0411.**

United States District Court,
W. D. Louisiana,
Alexandria Division.

March 23, 1982.

As Amended March 31 and
April 14, 1982.

Furher & Flournoy, Leonard Fuhrer, Alexandria, La., for plaintiff.

Voorhies & Labbe, Patrick Juneau, Jr., Allen, Gooch & Bourgeois, St. Paul Bourgeois, IV, Lafayette, La., for defendants.

## OPINION

NAUMAN S. SCOTT, Chief Judge.

Glen Austin Brown filed suit against Penrod Drilling Company (Penrod) and Offshore Casing Crews, Inc. (Offshore), pursuant to the Jones Act, 46 U.S.C. § 688 and the General Maritime Laws of the United States, for personal injuries allegedly sustained on January 19, 1979 while plaintiff worked on Penrod's drilling rig No. 44. Jurisdiction of this matter exists pursuant to the above laws. This case having been presented for trial, we now make the following findings and conclusions.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, born January 9, 1957, was 22 years old on the date of the accident, January 19, 1979. At that time, plaintiff was employed by Penrod and assigned to Penrod's drilling rig No. 44, a rig/barge located in coastal waters of Louisiana. Drilling rig No. 44 was a vessel in navigation within the meaning and purview of the Jones Act and General Maritime laws at all times pertinent to this case. Plaintiff worked as a roughneck on January 19, 1979, and was assigned duties as a crew member in furtherance of the mission of the vessel, thus establishing his seaman status under these laws.

At approximately 4:30 a. m. on January 19, 1979, plaintiff was struck about the head and right shoulder by a joint of casing being hoisted into the rig's derrick from the pipe rack floor 12 feet below. A joint of casing is a steel pipe 7 inches in diameter and 40 feet in length. The pipe rack is a rectangular deck area approximately 75 feet in length traversed by a 5 foot wide catwalk. Joints of casing were loaded onto the rig 3 at a time from an adjacent pipe barge and were placed at an incline, the higher end resting at the drill floor and the lower end on the pipe rack.

No drilling operations were going on, but casing was being run into the well at this time. These casing operations are characteristically loud and fast paced. Offshore's

6 man casing crew, assisted by Penrod's drilling crew, performed the casing operation.

Penrod's crane operator, situated on the rig, would hoist a load of casing from the deck of the pipe barge and direct it over the pipe rack area. Plaintiff was responsible for stabilizing and positioning the load, maneuvering it with a tag line attached to the joint ends farthest away from the drill floor. The near end of the load was placed within the V-door at the center edge of the drill floor and the other within the pipe rack area 12 feet below—thus creating an incline. The V-door consisted of 2 steel pieces a few feet apart that served to keep the high end of the joints from rolling off the center edge of the drill floor. Plaintiff next was required to unhook the slings (the hoisting connection) from the lower end of the load while one of the two V-door hands above would unhook the slings from the upper end of the load.

The joints' slanted position readied them for hoisting, one at a time, into a vertical position within the derrick on the drill floor where each would be connected to the string of casing already in the well hole. Prior to the hoisting of each joint, one of the V-door hands would drop a "rabbit" into the upper end of the joint. The rabbit was a 10 pound, one and a half foot long cylindrical piece of steel, slightly smaller in diameter than the casing. Normally, as a joint of casing was raised, the rabbit would travel the length of the joint, exiting at the lower end. This indicated that the joint was straight and unobstructed.

Once the rabbit was inserted, the pick up line, attached to the joint's upper end by a V-door hand and connected to the draw-works (the rig's power source), would be pulled taut by that crew member. This signaled Penrod's driller to engage the draw-works and hoist the joint through the V-door and into place within the derrick. This maneuver caused the joint to be dragged along the catwalk and against the V-door ramp before achieving a fully upright position. The V-door ramp is a 6 foot wide board, placed at an incline between the V-door and the pipe rack underneath the load of casing.

The angle of the joints and the dimensions of the rabbit were such that the rabbit would not exit the joint until that joint was up against the V-door ramp in a nearly vertical posture. Only then could the rabbit fall out, usually at the bottom of the V-door ramp and onto the catwalk.

Plaintiff was instructed to trail the joint being hoisted along the catwalk, retrieve the rabbit and hook it to a line lowered by a V-door hand to bring the rabbit back up to the drill floor for insertion into the next joint of casing. Only one rabbit was used during these casing operations. The logistics of this procedure were such that plaintiff had to station himself close to the bottom of the V-door ramp to retrieve the rabbit, a task that lasted no more than 20 seconds. Thereafter, plaintiff would step off the catwalk away from the V-door ramp and walk down to the end of the pipe rack to await the next load of casing from the pipe barge.

Immediately before the accident, plaintiff was in the process of retrieving the rabbit which had just fallen out of a hoisted joint of casing at the bottom of the V-door ramp. The driller began to hoist an unrabbitted joint of casing. This caught plaintiff off guard as no such movement of unrabbitted casing should have occurred. The V-door hands yelled down to plaintiff but these warnings were drowned out by the din of the draw-works. The joint struck plaintiff about his head and shoulder, rebounded approximately 5 feet and struck plaintiff again.

Under normal operating procedures, when the rabbit was within plaintiff's grasp or on the pipe rack floor, no new casing was to be hoisted. The hoisting of an unrabbitted joint and the failure to stop the aberrant operation or otherwise prevent the joint from traveling the length of the catwalk all constituted negligence on the part of defendants' crews. The unsafe working condition created an unseaworthy condition to exist on the rig as well.

Plaintiff was a relative newcomer to oilfield work and had never before taken part in a casing operation. Nevertheless, he followed the instructions given to him. No action or omission on the part of the plaintiff contributed to the cause of the accident.

■ The accident and resulting injuries were proximately caused by the unseaworthiness of Penrod Drilling barge No. 44 and the negligence of Penrod as a Jones Act employer. Concurrently, the accident and resulting injuries were proximately caused by the negligence of Offshore under the General Maritime laws. Thus, we find that Penrod and Offshore are liable and share equal responsibility for the damages suffered by plaintiff as a result of this accident. See *Leger v. Drilling Well Control, Inc.*, 592 F.2d 1246, 1249 (5th Cir. 1979).

■ Plaintiff suffered serious injuries including facial hemorrhages, 2 skull fractures, paralysis of the left side of his face, loss of hearing in his left ear and a right shoulder separation. Plaintiff's initial hospitalization lasted 16 days.

Overall, plaintiff underwent surgery 4 times. The first operation was performed to repair facial nerve damage. Although plaintiff has achieved the maximum recovery possible in this regard, the musculature in the left side of his face is permanently impaired. Plaintiff continues to experience a feeling of numbness on the left side of his face. He cannot blink or close the left eyelid, exhibit normal facial expressions or enjoy full taste sensation. Eating and drinking also pose some difficulty for plaintiff.

Plaintiff's vision was not appreciably impaired as a result of the accident. To maintain the normal use of his left eye he must lubricate and tape the eyelid shut or use a patch to protect the eye during sleep and use "artificial tears" eyedrops every 1–2 hours to protect it while awake. Generally, plaintiff will continue to experience occasional irritation and redness in his left eye.

A second operation was performed on plaintiff to correct a hearing loss caused by the accident. This procedure proved successful, leaving plaintiff with only minimal loss of hearing.

The third and fourth operations served to repair the shoulder separation. Plaintiff now has full range of movement although he will continue to experience occasional limitation of movement and mild discomfort from time to time.

The eyelid defect and cosmetic disfigurement are permanent. These injuries have caused and will continue to cause plaintiff mental distress, embarrassment, physical discomfort and inconvenience over his 52 year life expectancy. Considering further the pain and suffering plaintiff experienced as a result of his injuries, we find that an award of $75,000 is appropriate. Compare *Allen v. Seacoast Products, Inc.*, 623 F.2d 355, 364–366 (5th Cir. 1980); *Creel v. Drill Tender Jack Cleverly*, 264 F.Supp. 98, 104 (W.D.La.1966); *Walker v. Champion*, 288 So.2d 44, 47 (La.1973); *Batiste v. Iberia Parish School Board*, 401 So.2d 1224, 1228 (3rd Cir. 1981).

Medical testimony indicated that plaintiff should not engage in oilfield work due to his eye injury. Exposure to the elements (wind and dust) coupled with the practical difficulties of regularly medicating the eye while on the job were the bases for this conclusion. Not all outdoor work was foreclosed to plaintiff however.

Plaintiff returned to active employment on October 1, 1980 as a plumber's helper earning $5 per hour. His total earnings from that date to trial were $6,952.50. Subtracting $6,952.50 from what he would have earned from date of accident to trial with Penrod, we arrive at gross past lost wages totalling $48,241.00.

Dr. Jan Dugger, the only economist to testify at trial, utilized an effective tax rate of 17% in computing plaintiff's lost future wages. See infra. This approach, dictated by *Norfolk & Western Ry. Co. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), should apply to the award for past lost wages. We find that plaintiff is entitled to an award of $40,040.03 representing past lost wages net of taxes.

Plaintiff's previous work record is brief. After graduation from high school he worked as a laborer until employed by Penrod. Unemployment in Central Louisiana is relatively high. Future employment opportunities in this area for a man with plaintiff's background can be expected to approximate plaintiff's current job position and salary.

Plaintiff's work life expectancy from date of trial was 37 years. Applying the uncontested effective tax rates of 17% to the difference between plaintiff's current, annualized salary ($10,400)[1] and the annual salary he could have earned with Penrod ($22,999.60), plaintiff's loss of future wages is $10,457.67 annually net of taxes.

Dr. Dugger explained that to account for the present value of these lost future wages a discount rate of 6% was proper based upon an average of safe longterm investments over the past 30 years. He noted, too, that inflation during that time has remained almost constant with interest rates, averaging about 6%.

The Fifth Circuit has granted en banc rehearings to reconsider *Johnson v. Penrod Drilling Co.*, 510 F.2d 234 (5th Cir. 1975) (en banc), *cert. denied*, 423 U.S. 839, 96 S.Ct. 68–69, 46 L.Ed.2d 58 (1975) and allow inflationary cost of living pay raises along with a discount rate, to be applied to awards for future lost wages. *Culver v. Slater Boat Co.*, 644 F.2d 460, 466 (5th Cir. 1981) *(rehearing en banc granted); Byrd v. Reederei*, 638 F.2d 1300 (5th Cir. 1981), *rehearing en banc granted*, 650 F.2d 1324. Along with inflation, Penrod also dictated that gross income, before taxes, be considered, reasoning that both future tax liabilities and inflation rates proved too speculative. The viability of Penrod's inflation rule became suspect when the Supreme Court in *Norfolk & Western Ry. Co. v. Liepelt, su-*

*pra*, determined that the Federal Employers Liability Act, from which Jones Act rights and remedies are derived, requires a deduction from an award for future lost wages to account for projected income taxes. *Liepelt* only discussed inflationary factors in *obiter dictum. Id.* 444 U.S. at 494, 100 S.Ct. at 757.

To negotiate this problem we have, in the past, looked to the "Alaskan rule" of *Beaulieu v. Elliot*, 434 P.2d 665, 671 (Alaska S.Ct. 1967), which recognized that inflation offsets the interest rate that could be earned on safe investments and that the loss of future earnings component of damages should not be discounted to present value. *Maxie v. Odeco, Inc.*, No. 79–0669 (W.D.La., Alex.Div., 2/25/81), *aff'd*, 671 F.2d 1377 (5th Cir. 1982) *(per curiam); Ober v. Penrod Drilling Co.*, No. 78–1632 (W.D.La., Alex. Div., Dec. 23, 1980).[2]

We find that in this case the evidence supports the application of a 6% inflation factor and a 6% discount rate to an award for lost future wages. Considering further the erosion of Penrod, we recognize the offset of these figures and find that plaintiff is entitled to an award of $386,933.79 for loss of future earnings.

In the interests of judicial economy we make the alternative holding that to discount this award and not consider inflation, we apply a 6% rate to reflect a safe, longterm investment yield. This reduces the loss of future earnings component of damages to $154,114.68.

Plaintiff is entitled to judgment against Penrod and Offshore in the amount of $502,007.82 together with interest on $40,-074.03 (lost wages to date of trial) from date of judicial demand until paid and on the balance of the award from date of this judgment; each defendant to pay 50% of

---

1. Dr. Dugger figured lost future wages on a fulltime oilfield work schedule. The assumption of full-time work must apply to plaintiff's current employment in order to fairly determine the award for loss of future income. We therefore rely, not on plaintiff's average weekly earnings to trial, but upon a $5 hourly rate for a 40 hour per week in determining this award.

2. Although not followed previously owing to the contrary precedent of *Johnson v. Penrod Drilling Co.*, *supra*, this approach had found support in the Fifth Circuit prior to *Ober. See Davis v. Hill Engineering, Inc.*, 549 F.2d 314, 331–332 (5th Cir. 1977). Indeed, a majority of the circuits now consider inflation. *See Byrd v. Reederei, supra*, at fn. 19.

this award, reflecting their proportionate share of liability. See *Leger v. Drilling Well Control, Inc., supra,* at 1249. The appropriate interest rate to be applied is that set forth in La.C.C. art. 2924, as amended.