**William B. OVERSTREET, Sr., Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**Civ. A. No. 79–511–N.**

United States District Court,
M. D. Alabama, N. D.

July 1, 1981.

---

Jasper B. Roberts, Lewis B. Hickman, Jr., Montgomery, Ala., for plaintiff.

Barry E. Teague, U. S. Atty., Kenneth E. Vines, Asst. U. S. Atty., Montgomery, Ala., for defendant.

## MEMORANDUM OPINION

HOBBS, District Judge.

Plaintiff has sued the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., for alleged medical malpractice during the course of surgery to repair plaintiff's hiatal hernia at a United States Air Force hospital on June 21, 1974. Plaintiff is a retired veteran of the U.S. Air Force with twenty-three years of service. Plaintiff has had no experience in medicine or surgical procedures other than as a patient. Defendant United States has challenged plaintiff's right to bring the law suit on the ground that the statute of limitations bars plaintiff's claim. At the request of defendant, the trial has been bifurcated, and the single issue which has been tried thus far is whether plaintiff's action is barred by the statute of limitations. For purpose of the bifurcated trial on the statute of limitations issue, defendant admits that the Air Force surgeon in repairing plaintiff's hiatal hernia in 1974 negligently severed the hepatic artery, common bile duct, cystic artery and removed plaintiff's gallbladder.

It is without dispute that plaintiff was not advised in 1974 that the operation for repair of his hernia had resulted in the severing of the hepatic artery, common bile duct, cystic artery or removal of plaintiff's gallbladder. Defendant contends that plaintiff was advised by Dr. Raymond S. Crawford, another Air Force doctor, in September 1976 that plaintiff's gallbladder had been removed. If plaintiff knew or should have known of the existence and cause of his injury in September 1976, then his claim is time barred because it was not presented in writing within two years after such claim accrued. 28 U.S.C. § 2401(b). Plaintiff's claim was not filed until February 28, 1979. Plaintiff, on the other hand, contends that he did not know of the existence and cause of his injury until September, October or November 1977, in which event his claim was timely filed.

The parties agree that *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) provides the applicable definition for when a claim accrues. *Kubrick* holds that a claim accrues when plaintiff knows both the existence and the cause of his injury. This Court holds that defendant has not sustained its burden of proving that plaintiff knew both the existence and the cause of his injury prior to September 1977.

In *Kubrick*, plaintiff underwent surgery on his femur. Following surgery, an infected area was treated with neomycin until the infection cleared. The neomycin treatment apparently caused bilateral nerve deafness. Several months after the surgery, doctors advised Kubrick that it was highly possible that the hearing loss was due to the neomycin treatment. Kubrick filed a claim for a disability with the Veterans Administration, alleging that the neomycin treatment had caused his deafness. The Veterans Administration denied the claim on the basis that no causal connection

existed between the neomycin treatment and the hearing loss and that there was no evidence of negligence or error of judgment on the part of the Veterans Administration doctors in using the neomycin treatment.

Kubrick pursued his VA claim through the VA Board of Appeals, and in 1972, more than four years after the surgery, the Board of Appeals recognized that Kubrick's hearing loss may have resulted from the neomycin treatment, but denied the appeal on the ground that the treatment was in accordance with acceptable medical practice at that time.

Kubrick then filed suit under the Federal Tort Claims Act, alleging negligent medical treatment which resulted in his loss of hearing. The Government raised the defense of the statute of limitations, urging that the claim accrued in January 1969, when plaintiff learned that his hearing loss probably resulted from the neomycin. The district court conceded that normally the statute of limitations begins to run from the time a plaintiff discovers or reasonably should discover *his injury and its cause.* The district court held, however, that the statute did not begin to run with respect to Kubrick until he had some "reasonable suspicion" that there was negligence in his treatment. The district court held that Kubrick did not have a reasonable basis for knowing that the use of neomycin in his treatment was negligent until a time within two years of the filing of his claim under the Federal Tort Claims Act, and, therefore, that the statute of limitations did not bar his suit. The Court of Appeals affirmed, but the Supreme Court reversed, holding that the statute of limitations began to run from the time plaintiff knew or reasonably should have known of his injury and its cause, irrespective of whether plaintiff knew that the injury was negligently inflicted. (Three Justices dissented and would have held that Kubrick's claim was not barred.)

Applying the test of the majority opinion in *Kubrick,* when did plaintiff Overstreet know or when should he reasonably have known of his injury and its cause? The answer requires a review of plaintiff's medical problems following his hernia surgery in 1974.

As already noted, no one told plaintiff following his hernia operation that the surgery had been negligently performed so that his hepatic artery, common bile duct and cystic artery were severed, and his gallbladder was removed. Obviously the patient had no way of knowing that he had been injured. He was sewed up following the surgery, and presumably everyone hoped that he would recover uneventfully from the surgery.

Within a few weeks after plaintiff's hernia operation and as soon as he had sufficiently recovered, plaintiff underwent a much more serious operation. This operation was unrelated to the hernia operation. It involved the emergency removal of plaintiff's esophagus with a subsequent removal of a portion of plaintiff's colon for use as the replacement tissue for the portion of the esophagus which had been removed. Dr. Crawford explained that this process involves various surgical abdominal procedures in order to move the severed portion of colon up to the esophagus so that plaintiff "will have continuity in his esophagus where his esophagus was." Dr. Crawford characterized this surgery as a "colon interposition."

The hospital records reflect that plaintiff underwent surgery in the area of the abdomen seven times between the hernia operation and the final operation in September 1977. Plaintiff was adjudged one hundred per cent disabled by the Veterans Administration in 1975 apparently because of problems arising out of the colon interposition.

With respect to the series of operations subsequent to the operation for repair of the hiatal hernia, plaintiff was again entirely ignorant of what procedures were followed during the operation. As the patient, he was entirely dependent on the doctors performing the surgery.

The testimony at the trial seemed to focus on when plaintiff learned that his gallbladder had been removed. Defendant presented testimony that plaintiff learned of the removal of his gallbladder at the

time of his hospitalization in the summer of 1976. On August 9, 1976, plaintiff was hospitalized for jaundice and fever. Dr. Crawford, who was in charge of plaintiff's treatment at Maxwell Air Force Hospital, gave plaintiff a series of tests in an effort to determine the cause of his problem. The tests included multiple blood studies, liver function studies, spinal tap, liver scans, multiple x-ray procedures, chest x-rays, kidney x-rays, an IVP, intravenous cholangiogram and x-ray of his bile duct.

On August 19, 1976, plaintiff's hospital records report that dye was injected into plaintiff's vein to "visualize by x-ray the gallbladder and bile ducts." Obviously and understandably, Dr. Crawford did not recall from some two years previously that plaintiff's gallbladder had been removed in the surgery to repair plaintiff's hiatal hernia.

On August 26, 1976, plaintiff was released from the hospital much improved. No one had determined the cause of his fever or jaundice, and no one could have advised him as to such cause. On August 28, he was readmitted with fever of 103 degrees and probability of surgery. On September 2, 1976, Dr. Crawford reviewed plaintiff's hospital record of the 1974 surgery and noted that he had had his gallbladder removed at the time of the hernia operation. The doctor contemplated recommending further surgery at Keesler Air Force Base Hospital, but decided to have further tests run in Birmingham. For one of these procedures, plaintiff's consent was required, and he signed a form which indicated tests were to be made of his gallbladder. The consent form was changed after he had signed it to show that the gallbladder had been previously removed by surgery. Plaintiff initialled the change on the form but has no recollection of signing the form or initialling it. Plaintiff testified that he had signed so many consent forms for multiple surgical procedures that he would not have paid much attention to the words of the form since he knew that he was authorizing a diagnostic procedure to aid in discovering his problem.

The procedure in the Birmingham hospital was conducted on September 13, 1976. It was also a study to try to determine if something in the biliary system was causing plaintiff's fever and jaundice. The hospital in Birmingham sought to penetrate plaintiff's esophagus into the biliary tract with a gastroscope to better visualize from the "other end" the area which had not yielded the cause of plaintiff's problem in Montgomery by an intravenous cholangiogram. The hospital in Birmingham did not succeed in getting the gastroscope through plaintiff's esophagus—presumably because of the previous surgery involving the attachment of the colon to the esophagus. Accordingly, the procedure in Birmingham was of no diagnostic benefit.

On plaintiff's return from Birmingham on or about September 16, 1976, the hospital records at Maxwell AF Hospital reported that plaintiff was again "entirely asymptomatic from his disease." Plaintiff was discharged to be followed on a monthly basis and "to return only if symptoms of recurrent cholangitis appeared." A series of sophisticated diagnostic tests had failed to reveal the existence of plaintiff's injury or its cause even to plaintiff's doctors.

Dr. Crawford understandably said he had only a "fuzzy recollection" of any conversation with plaintiff, but he thought he had told plaintiff in September 1976 that his gallbladder had been removed since this was the time that the doctor learned such fact.

There are nurses' notes at the time plaintiff was readmitted to the Maxwell AF Hospital in September 1977, which state: "Bowel duct 'inadvertently cut'—GB had to be removed. Esophagus removed in 1974 at Keesler. 7 total operations. last admission—jaundice and fever 1976—checked q month."

Defendant provided testimony that such history is usually obtained from the patient. Plaintiff denies giving such information to the nurse and urges that the information came from the hospital records. The patient and the hospital record are both concededly possible sources of the information.

Defendant urges that the error in referring to the "bowel" duct as having been severed, rather than the bile duct, supports its contention that a nurse misunderstood plaintiff's verbal statement or that the plaintiff misstated what had happened to him. The Court is of the opinion that it is at least as likely that the error was in transcribing illegible notes as in misunderstanding a verbal communication. Anyone who has seen a volume of hospital and doctors' and nurses' notes would agree that they are seldom models of clarity, and it is at least as logical to speculate that the erroneous information of a severed "bowel duct" came from inability to read accurately the written notes as from misunderstanding a verbal communication.

When plaintiff's deposition was taken two or three years after September 1977, plaintiff thought that his conversation in which the doctor told him about his gallbladder took place shortly after some tests were run. Dr. Crawford said the tests were run only in 1976. Defendant urges, therefore, that plaintiff learned of his gallbladder removal in 1976. Plaintiff insists that he was apparently in error in recalling that the information was imparted to him shortly after the tests, but he is certain that it was shortly before he was sent to Keesler Air Force Hospital in November, 1977.

Plaintiff testified that he expected to have an operation performed by Dr. Crawford at Maxwell in September, October or November of 1977. At the time of this hospitalization, plaintiff testified that Dr. Crawford asked him if his gallbladder had been removed. Plaintiff replied that he did not know. This was in plaintiff's hospital room in the presence of plaintiff's daughter and son-in-law, who were not in Alabama in 1976. They testified and corroborated plaintiff's testimony. Plaintiff and his wife further testified that the doctor left plaintiff's room to refresh his memory from plaintiff's hospital records. When he returned, he met plaintiff's wife in the hall and told her the operation would need to be done at Keesler Hospital because plaintiff did not have a gallbladder. He then came into the room and reported the same information to plaintiff and the two other members of plaintiff's family.[1]

The next day, according to plaintiff, he was transferred by air to Keesler. Dr. Crawford testified that plaintiff was transferred for "further evaluation at Keesler."

The evidence is thus in sharp dispute whether plaintiff knew or should have known of the removal of his gallbladder in 1976 or 1977. The Court regards it as unnecessary to resolve this dispute. The removal of plaintiff's gallbladder was not plaintiff's injury, nor was it the cause of plaintiff's fever and jaundice which necessitated the surgery at Keesler in 1977.

Dr. Crawford conceded that no ill results flow from the removal of a gallbladder. He testified that a gallbladder is of no functional significance. Moreover, with all the surgery performed on plaintiff, plaintiff had no reason to attach any importance to the removal of his gallbladder. For all he knew, it could have been a proper procedure when he had his colon interposition. If he had asked Dr. Crawford whether such removal was causing his illness, the answer would have been "no." The cause of plaintiff's fever and jaundice were the strictures from the inadvertent or negligent severance of his bile duct. This was not discovered until sophisticated diagnostic procedures were performed at Keesler in late 1977 immediately prior to surgery. Dr.

---

1. Plaintiff does not dispute Dr. Crawford's contention that he discovered the fact of plaintiff's gallbladder removal in 1976. Plaintiff suggests, instead, that Dr. Crawford, who had seen hundreds of patients between September 1976 and September 1977, simply forgot about the removal of plaintiff's gallbladder during the period between the 1976 and 1977 hospitalizations. This view that Dr. Crawford simply forgot is reinforced by the fact that on three separate occasions between September 1976 and September 1977, Dr. Crawford failed to mention plaintiff's "cholecystectomy" (removal of the gallbladder) when writing a description of plaintiff's medical history. Dr. Crawford had no explanation for this failure to mention plaintiff's earlier operation in these descriptions despite the fact that such summaries are admittedly intended for the future use of other physicians.

Crawford suspected that a probable cause of plaintiff's jaundice and fever was the strictures from severance of the bile duct, but this was only one probable cause, and in 1976 it is undisputed that none of the multiple diagnostic procedures had been able to establish the cause of plaintiff's illness.

Dr. Crawford acknowledged that he could not say that he ever told plaintiff that the operation for hernia repair had resulted in the severance or cutting of his common bile duct, hepatic artery or cystic duct. When he was asked by the Court if it would not be highly unusual for him to refer to any inadvertence or negligence on the part of another doctor, he responded: "Yes, sir, I doubt seriously if I would ever do that."

Dr. Crawford stated that the stricture which was discovered in the procedures and operation at Keesler in 1977 would not have been there if the bile duct had not been inadvertently severed in the 1974 hernia operation.

The Court is of the opinion for many reasons that it is unlikely that Dr. Crawford speculated with plaintiff that strictures negligently caused by a fellow Air Force doctor were causing plaintiff's jaundice and high fever when Dr. Crawford, through repeated tests, was unable to confirm this fact, and the evacuation to Keesler Hospital in 1977 was for "further evaluation." It was the sophisticated tests run at Keesler which could not be performed at Maxwell Air Force Hospital that established the cause of plaintiff's illness. It would be contrary to *Kubrick* and harsh to conclude that plaintiff had reason to know what his doctors only suspected—particularly when the logic of the situation compels the conclusion to this Court that the doctors would not have communicated such fears and suspicions to plaintiff. The facts in this case are polar to *Kubrick*, where for five years before Kubrick filed his claim under the Federal Tort Claims Act, Kubrick knew of his injury and its cause; i. e., that his deafness was caused by the use of neomycin in the treatment of an infection.

The Court concludes that plaintiff did not know of the existence and cause of his injury until the cause of his illness was diagnosed at Keesler Hospital in December, 1977. When the strictures were diagnosed and located, surgical procedures were promptly initiated and plaintiff's illness from this cause was alleviated. The issue of the statute of limitations is resolved adversely to defendant.

A trial date for a hearing on the remaining issues in this lawsuit will be set at the earliest opportunity.