**William B. OVERSTREET, Sr., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 79–511–N.

United States District Court, M. D. Alabama, N. D.

Dec. 14, 1981.

MEMORANDUM OPINION

HOBBS, District Judge.

In this action, plaintiff William Overstreet has sued the United States for damages under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.*, for alleged medical malpractice during the course of surgery to repair plaintiff's hiatal hernia at a United States Air Force hospital on June 21, 1974. It is conceded that in the course of such surgical procedure, the doctors performing the surgery inadvertently severed the common bile duct, the hepatic artery, and the cystic artery. It is also conceded that plaintiff has had to undergo prolonged and many hospitalizations as well as multiple, major surgical procedures in an effort to correct problems which arose out of the medical error of severing plaintiff's common bile duct. At the time of the second stage of the trial in November 1981, plaintiff was still totally disabled from results flowing from the severance of the common bile duct in 1974.

On the motion of the Government, the trial had been bifurcated to enable the Government to present at a separate hearing in June 1981 the issue of whether plaintiff's claim was barred by the statute of limitations. By a memorandum opinion on July 1, 1981, this Court rejected the Government's defense of the statute of limitations, 517 F.Supp. 1098, and a trial on the remaining issues was held on November 23, 1981.

After considering all of the evidence, the Court concludes that plaintiff is entitled to recover against defendant and sets plaintiff's damages at $446,617.00.

## FACTS

Plaintiff, who was then forty-four years of age, was operated on for repair of a hiatal hernia at Maxwell Air Force Base on June 21, 1974. The operation was needed because of an esophageal disease which, due to a defective valve, allowed gastric juice to reflux into plaintiff's esophagus. At the time of the surgery, plaintiff had retired as a veteran of the United States Air Force with twenty-three years of service. He has

Jasper B. Roberts, Lewis B. Hickman, Jr., Montgomery, Ala., and C. Neal Pope, Pope & Hermann, Atlanta, Ga., for plaintiff.

Barry E. Teague, U. S. Atty., Kenneth E. Vines, Asst. U. S. Atty., Montgomery, Ala., for defendant.

only a layman's knowledge of medical and surgical procedures.

When during the course of plaintiff's surgery in June 1974, defendant's doctors inadvertently severed plaintiff's common bile duct, hepatic artery and cystic artery, emergency circumstances were created by these medical errors and the repair of the hiatal hernia was not successful. Moreover, the effort to repair the problems created by the severing of the bile duct has created a life threatening condition for plaintiff.

Approximately six weeks after the unsuccessful surgery to repair the hiatal hernia, plaintiff was suffering from internal bleeding, reflux symptoms, nausea and vomiting. He was transported to the hospital at Keesler Air Force Base. On August 16, 1974, while hospitalized at Keesler, plaintiff suddenly began to hemorrhage. Because of an inability to control the bleeding, plaintiff was required to undergo further surgery. An esophagectomy was carried out. A feeding gastrostomy was also performed, which was "difficult because of the adhesions and scarring from his previous operation."

On October 16, 1974, while still at Keesler AFB Hospital, plaintiff underwent further major surgery to accomplish the complete removal of his esophagus and its replacement with part of his colon. In the opinion of Dr. Ryan DeMeester, Professor of Surgery and Chief of the Thoracic Surgery Service at the University of Chicago School of Medicine, this would not have been necessary if the bile duct had not been severed. While still hospitalized, because of recurring high fever and abscesses where the colon and the esophagus had been anastomosed, plaintiff suffered a cervical abscess which subsequently was incised and drained. When plaintiff later developed abdominal distension and other problems, he underwent still further surgery on his stomach on November 6, 1974. It was then discovered that he had developed an abscess at the site of the colostomy. The remaining portion of the right colon was brought out as a separate proximal colostomy. It was also noted that "there were draining fistulae from the gastrocolon anastomosis and from the site of the feeding gastrostomy tube." Further surgical repair was effected and multiple drains were left in the abdomen. Plaintiff also underwent the insertion of a chest tube because of a pleural effusion. He developed severe costochondritis and had multiple intercostal nerve blocks on the 7th, 8th, 9th, 10th, 28th and 30th of January, 1975 and also on February 6, 1975. He was thus hospitalized continually for a period of eight months.

Mr. Overstreet was discharged from the hospital on February 8, 1975. His prognosis in February 1975 was for further surgery to re-establish the gastrointestinal integrity by closing the right colostomy. He also was scheduled for repeated visits to the surgery clinic for esophageal dilations.

Mr. Overstreet underwent further hospitalization in April 1975 with more operative procedures. When released from the hospital in April 1975, plaintiff's prognosis was: "Excellent. The patient appears to be well-healed from all his surgery procedures."

Within a few weeks, however, plaintiff was readmitted to the hospital for further surgical procedures stemming from the efforts to repair the multiple problems arising out of the initial error of severing plaintiff's bile duct. The prognosis after this hospitalization was more guarded and predicted continued episodes of esophageal reflux and bowel obstruction due to adhesion resulting from his multiple surgical procedures. At no time during any of these readmissions to the hospital, which involved multiple major surgical procedures, did anyone suggest to plaintiff that the cause of his problem was the severing of the bile duct and the failure to accomplish satisfactory repair.

In February 1976, plaintiff was hospitalized at Maxwell Air Force Base Hospital with cholangitis, jaundice and fever. Efforts to determine the cause of his problem were unsuccessful, although he underwent multiple tests at Maxwell Air Force Base Hospital and at the University of Alabama Medical Center. When the symptoms of his illness were relieved, plaintiff was released

from the hospital with no determination as to the exact cause of his recurring problems.

In September 1977, plaintiff was readmitted to Maxwell Air Force Base Hospital with ascending cholangitis, jaundice and fever. The attending physician testified that on plaintiff's hospitalizations in 1976 and 1977, he "suspected" that plaintiff's problems stemmed from adhesions or strictures that had developed from the 1974 surgery in trying to repair the severance of the bile duct. In December 1977, plaintiff was returned to Keesler Air Force Base where further diagnostic procedures suggested that such strictures were the cause of many of his recurring problems. Dr. DeMeester was of the opinion, however, from his study of the medical records that the first "concrete evidence" of a stricture causing plaintiff's problems was not established until March 1980. Dr. William Dismukes, who is a professor at the University of Alabama Medical School, teaching infectious diseases and microbiology, testified that although plaintiff underwent numerous tests to try to uncover the cause of his recurrent episodes of ascending cholangitis, the first objective evidence that its cause was the strictures from the severance of the bile duct was not revealed until December 1977 and the conclusive evidence of the stricture causing plaintiff's recurrent problem was not known until March 1980. Dr. DeMeester and Dr. Dismukes both testified that studies showed a stenosis at the opening of the right and left duct. This study showed a significant change between the December 1977 study and the 1980 study. An effort was made through further surgery in March 1980 to repair the damage, but plaintiff remains a critically disabled individual. The Veterans Administration adjudged plaintiff one hundred per cent permanently disabled following his 1974 surgery, and no one suggests that this evaluation is in error.

Dr. DeMeester evaluated plaintiff's present critical condition and stated that plaintiff has two courses of action relative to his treatment. First, plaintiff can undergo further surgery to try to repair the damage from the severance of the bile duct, or he can continue on his present course, which entails continuing dosage of antibiotics in an effort to control the abdominal infection caused in large part by bile flowing into the stomach due to the suturing of one end of the severed bile duct too close to the stomach.

Dr. DeMeester acknowledges that further surgery would involve grave risks of death, but he is concerned that plaintiff will not be able to "manage" the infection through continued use of antibiotics. Dr. DeMeester was of the opinion that only a very few surgeons in the United States have the skill and experience to undertake the type of surgery that would be required. He estimated that only five or six surgeons are capable of undertaking such surgery.

Dr. DeMeester testified that the severing of the bile duct and arteries incident to the hiatal hernia repair fell below an acceptable standard of care. He was also of the opinion that the location of the transected end of the bile duct by suturing too close to the stomach was improper and was the cause of plaintiff's recurring infection.

The Government put on no evidence to dispute these opinions of Dr. DeMeester.

Dr. Dismukes expressed the concern that the antibiotics being administered to plaintiff would not be sufficient to control the infection problem. Although recognizing the high risks for plaintiff from further surgery, he thought it nevertheless should be attempted. He fears the bacterial organisms will become resistant to the antibiotics, resulting in further degeneration of plaintiff's liver and eventual death.

Neither successful surgery nor the drug program will ever totally relieve plaintiff of all of the acute problems arising out of the severed bile duct. He will never have a normal esophagus. He will continue to have major dietary problems, diarrhea, and reflux problems, even after the most successful surgery. These problems would not be present if the 1974 hiatal hernia repair had been successful.

## STATUTE OF LIMITATIONS

As noted, the United States sought, and the Court granted, a bifurcated trial with the single issue of the statute of limitations being considered at the first trial. The argument urged by the United States for such a bifurcated proceeding was that it would save time and expense for the parties and the Court in the event the Court agreed with the contention of the United States that the statute of limitations precluded any recovery for plaintiff. The purpose of a bifurcated trial surely was not to give the United States "two bites" at the statute of limitations question. But in its brief filed after the trial on the issue of liability and damages, the Government has renewed its rejected argument that plaintiff's claim is barred by the statute of limitations.

Heeding the admonition of Justice Jackson that "wisdom should not be rejected because it comes late," the Court will consider the Government's latest arguments and respond to its renewed contention as to the statute of limitations.

█ Plaintiff filed his administrative claim under the Federal Tort Claims Act on February 28, 1979. The claim arose out of the alleged negligent cutting of his bile duct, hepatic artery and cystic artery in the surgery performed at Maxwell Air Force Base Hospital on June 21, 1974. Under the Federal Tort Claims Act, a plaintiff must file his administrative claim in writing within two years after such claim accrued. In *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), we are instructed that a claim accrues when a plaintiff knows or reasonably should know of his injury and its cause. The Supreme Court rejected the contention that plaintiff also had to have reason to know that the injury was negligently inflicted.

The inquiry for the Court on the statute of limitations issue, therefore, is when did plaintiff know or when should he reasonably have known of his injury and its cause. If plaintiff knew or should have known of his injury and its cause in 1976, his claim is barred. If he learned after February 28, 1977, his claim is not barred.

Plaintiff does not recall anything being said to him about severance of a bile duct or artery following the 1974 surgery. The doctor who performed the surgery stated in his deposition that while Mr. Overstreet was in intensive care shortly after the initial surgery, he told Mr. Overstreet that the operation was more complicated than anticipated and in performing the surgery, "we divided a duct," which had to be repaired, but "we got everything repaired," and the plaintiff "would be all right." The doctor testified on his deposition that he "did not make a distinction to Mr. Overstreet as to whether we were planning to divide the duct or not." The Government properly does not contend that Mr. Overstreet knew or should have known of the existence and cause of his injury from these comments. The Government argues that Dr. Crawford, who was present at the original operation for the hiatal hernia repair in 1974 but did not actively participate in the surgery, must have told plaintiff in 1976 that his gallbladder had been removed rather than a date in 1977, which is the date that plaintiff and other witnesses testified that such information was conveyed to plaintiff. Defendant contends that not only must the Court accept the testimony that plaintiff learned of the removal of his gallbladder in 1976, but it also must accept that plaintiff learned in 1976 that his bile duct was mistakenly severed because plaintiff had testified in his deposition that he learned of the bile duct being severed at the time he learned the gallbladder had been removed. In other words, defendant contends that plaintiff must have been in error when he says he learned in 1977 of the 1974 gallbladder removal, but he was correct when he said he learned of the gallbladder removal and the bile duct severance at the same time. However, plaintiff and other witnesses were positive that plaintiff learned of the bile duct severance in 1977. Plaintiff's daughter and son-in-law testified to being present in plaintiff's hospital room when Dr. Crawford communicated this information to plaintiff. They were not even in Alabama in 1976, but it is unchallenged that they

were present in Alabama at the hospital in 1977 immediately prior to plaintiff's being removed to Keesler Air Force Base Hospital for "further evaluation."

Dr. Crawford acknowledged that he could not say that he ever told plaintiff that the operation for hernia repair had resulted in the severance or cutting of his common bile duct, hepatic artery or cystic duct. When he was asked by the Court if it would not be highly unusual for him to refer to any inadvertence or negligence on the part of another doctor, he responded: "Yes, sir, I doubt seriously if I would ever do that."

Although Dr. Crawford is of the opinion that he told plaintiff of the removal of his gallbladder in 1976, the removal of plaintiff's gallbladder was not plaintiff's injury, nor was it the cause of plaintiff's fever and jaundice and all of the multiple surgical procedures which left plaintiff one hundred per cent totally disabled.

Dr. Crawford conceded that no ill results flow from the removal of a gallbladder. Such removal would be of no functional significance. Moreover, with all the surgery performed on plaintiff, he had no reason to attach any importance to the removal of his gallbladder. For all he knew, the removal of the gallbladder could have been a proper procedure when he had his colon interposition or during any of the other twenty surgical procedures seeking to repair the initial error. If Mr. Overstreet had asked Dr. Crawford whether the removal of his gallbladder was causing any of his problems, the answer would have been "no." A cause of plaintiff's multiple problems was the strictures from the surgical mistake of severing his bile duct.[1] Dr. DeMeester testified that the first "concrete evidence" of a stricture was not discovered until sophisticated diagnostic procedures were performed at Keesler in late 1977. Conclusive evidence was not available until 1980. Dr. Dismukes agreed.

Dr. Crawford testified that he suspected that a probable cause of plaintiff's recur-

ring ascending cholangitis accompanied with jaundice and fever was the strictures from severance of the bile duct, but he conceded this was only one probable cause, and in 1976 it is undisputed that none of the multiple diagnostic procedures had been able to establish the cause of plaintiff's illness, and some of the earlier tests gave a contraindication of a stricture.

Dr. DeMeester testified that another cause of plaintiff's problems, in addition to the strictures in the bile duct, was that in the repair following the severance of the bile duct the severed end of the duct was attached to the duodenum too close to the stomach so that bile flowed into the stomach. This created major problems for plaintiff. No one apparently suspected this cause until 1978, and there is no indication that this information was conveyed to plaintiff even up to the time he filed suit.

█ The Court is of the opinion for many reasons that it is unlikely that Dr. Crawford speculated with plaintiff that strictures caused by the error of a fellow Air Force doctor were causing plaintiff's jaundice, disability, high fever and multiple operations when Dr. Crawford, through repeated tests, was unable to confirm this fact, and the evacuation to Keesler Hospital in late November 1977 was for "further evaluation." It would be contrary to *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) and harsh to conclude that plaintiff had reason to know what his doctors only suspected—particularly when the logic of the situation compels the conclusion that the doctors would not have communicated such fears and suspicions to plaintiff. The facts of this case are polar to *Kubrick*, where for five years before Kubrick filed his claim under the Federal Tort Claims Act, Kubrick knew of his injury and its cause; namely, that his deafness was caused by the use of neomycin in the treatment of an infection.

Mr. Overstreet was totally dependent not only on his doctors' skill but also their com-

---

1. Dr. DeMeester testified that a cholangiogram is the best method for determining the presence of strictures. Cholangiograms done post-operatively showed a good flow through the repaired bile duct with no evidence of stricture.

munications with him. After each surgery, he was sewed up. When he was required to have his entire esophagus removed a few months following the unsuccessful hiatal hernia repair and his colon substituted for his esophagus, none of his doctors even suggested to him that a cause of the ineffective hiatal hernia repair requiring the second surgery was the severance or "division" of the bile duct, hepatic artery and cystic artery. As noted, plaintiff was not even told that some of these things had occurred, and to the extent that he allegedly was told of them, no one suggested that the "division of the duct" was not planned as an incident to the operation. If the doctors did not tell plaintiff that they had erred in completely severing the common bile duct after the first surgery or at the time of the second major surgery, or that the removal of his esophagus was caused in whole or in part by problems incident to a surgical error in severing vital areas of his body, by what logic is this Court asked to conclude that in 1976, when the doctors only "suspected" that plaintiff's continuing problem was caused by strictures from severance of the common bile duct, that they then explained to him their errors in the 1974 surgery and how they suspected that perhaps these errors were causing plaintiff's recurring problems?

The statute of limitations has its place in the law when one suffers an injury, knows of the injury, and realizes how the injury was caused. It has no area of operation under the facts in this case.

The Court adheres to its opinion that plaintiff Overstreet did not know and reasonably would not have known of his injury or its cause so as to have his claim barred by the statute of limitations.

## LIABILITY

■ It is admitted that the severing of the common bile duct, hepatic artery and cystic artery is a totally unanticipated and unusual occurrence in attempting to repair hiatal hernias. According to Section 6–5–484 of the Alabama Code, the standard of care owed to patients by physicians and surgeons in Alabama is "such reasonable care, diligence and skill as physicians [and] surgeons ... in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case." Cf., *Zills v. Brown*, 382 So.2d 528 (Ala.1980) ("Same general neighborhood" rule encompasses national standard of care for reasonably skilled physicians acting in same or similar circumstances.).

Dr. DeMeester, a recognized authority in the field of thoracic surgery with particular emphasis on esophageal surgery and hiatal hernias, studied the medical records of the plaintiff from the time of the 1974 surgery to the trial date and also the depositions of the doctor who performed the surgery and the depositions of other doctors who have treated plaintiff. He testified that the surgery performed on plaintiff in 1974 departed from and was below the standard of skill generally for competent surgeons within the national medical community who perform hiatal hernia repair. The Government presented no testimony to dispute the conclusion of Dr. DeMeester. Dr. DeMeester was of the opinion that the twenty-seven hospitalizations that plaintiff has had subsequent to the operation in June 1974 have been caused in whole or in substantial part by the cutting of plaintiff's bile duct in the June 1974 surgery and the ineffective efforts to repair the damage from such severance.

## DAMAGES

■ Based upon the testimony presented at the second stage of the bifurcated trial, the Court finds that the plaintiff's disability is permanent and the likelihood is that such disability will remain total. The evidence established that at the time of the initial surgery on June 21, 1974, plaintiff, having retired from the Air Force, had substantially completed his studies in radio and television at Trenholm State Technical College. The parties have stipulated that plaintiff earned an average of $16,000.00 per year in 1973 and 1974 following his retirement up to the date of the initial surgery. Plaintiff urges that, in the absence of his disability brought on by the surgery, he would presently be earning a $21,663.00 annual salary. The Court finds a $16,000 annual salary to

be reasonable in light of plaintiff's age, education, and retired status. Therefore, plaintiff's loss of earnings for the past 7.5 years amounts to $120,000.00. On the other hand, plaintiff has received a total of $89,335.00 in disability benefits from the Veterans Administration over this period of time. In order to receive full disability benefits, it was necessary for plaintiff to waive retirement benefits, which by trial date would have amounted to $51,088.00. Accordingly, plaintiff has received $38,247.00 more in disability benefits than he would otherwise be entitled to receive in retirement benefits. Subtracting the latter figure from the $120,000.00 in lost wages, the Court finds that plaintiff is entitled to recover $81,753.00 in past lost wages. In addition, the Court finds that plaintiff could reasonably expect an annual salary of $16,000.00 over an expected working life of 13.6 years for a total of $217,600.00 in future lost wages. The difference per year of $8,000.00 between disability and retirement pay over the expected working life of 13.6 years for a total of $108,800.00 must be subtracted in order to arrive at plaintiff's future loss of income. When the $108,800.00 future loss of income figure is discounted to its present value using a discount rate of six per cent, the true loss is $64,864.00. Accordingly, the Court finds that plaintiff is entitled to an award of $64,864.00 for future lost wages.

The evidence is undisputed that even if plaintiff does not decide to have major surgery, plaintiff will continue to require recurring, annual medical treatment in the future. As a retired service man, he is entitled to continue to avail himself of free medical care. Expert testimony at the trial on damages established that the estimated value of such future treatment is $5,000.00 annually, assuming that inflation does not continue to escalate such costs. Based on a life expectancy of twenty-four years, the future medical care for plaintiff if he did not avail himself of medical services available to him as a retired serviceman would cost him $120,000.00, assuming no inflation. This figure when discounted to its present value, using a discount rate of six per cent, yields a figure of $52,644.00. Dr. DeMeester and Dr. Dismukes were of the opinion

that plaintiff should consider further major surgery, which Dr. DeMeester estimated would cost between $65,000.00 and $100,000.00. If this surgery is successful, it would eliminate the recurring annual medical expense. This estimate includes travel to a major medical center, costs during pre-operation tests, prolonged hospitalization, medical fees, and so forth. The Court thinks plaintiff should have this election and awards $100,000.00 in lieu of the $52,644.00 figure.

Plaintiff has suffered a horrendous amount of physical pain and mental anguish as a result of the negligent slip of the surgeon's scalpel. He has been hospitalized twenty-seven times since the 1974 surgery, has undergone twenty operations, many of them major surgery. Most of the pleasurable activities that are associated with life are now beyond plaintiff's reach. He will always suffer from diarrhea because of his shortened colon. He will continue to have to sleep at an elevated angle of 45 degrees in an effort to reduce his reflux problem. He continues to have recurring episodes of ascending cholangitis. He will have to undergo further life threatening major surgery or must continue to try to have his infection controlled by antibiotics. Plaintiff will continue to experience a great deal of physical pain and mental anguish in the future. The Court is of the opinion that $200,000.00 is a reasonable sum to compensate plaintiff for the pain and suffering that he has endured and will continue to face in the future.

Plaintiff asserts that any prospective award of damages should be computed with the use of an inflation factor. Although the influence on future damages of inflation is a probable component in a calculation of damages, see *Norfolk and Western Railway Co. v. Liepelt*, 444 U.S. 490, 494, 100 S.Ct. 755, 757, 62 L.Ed.2d 689 (1980); *Culver v. Slater Boat Co.*, 644 F.2d 460, 466 (5th Cir. 1981) (en banc rehearing granted on "inflation factor" in damages awards), the Court declines to specifically give weight to an inflation factor as such when it has not made an adjustment for the fact that the sum awarded plaintiff is not taxable whereas earnings would be. Moreover,

the Court has discounted the prospective elements of the damages award to present value using a six per cent discount rate rather than a substantially higher figure that is more compatible with inflation. The Court is aware that the calculation of damages is not susceptible of mathematical precision. The most significant elements of plaintiff's damages are the pain, mental anguish in the past and in the future, and the inability of plaintiff to lead a normal life or engage in those multiple activities which he enjoyed prior to his 1974 surgery. It is impossible to measure this loss, and in a real sense it is impossible to compensate adequately for such loss. The Court is of the opinion that the total award in this case is a fair and reasonable award.

In summary, the Court finds that plaintiff is entitled to recover: $81,753.00 in past lost wages, $64,864.00 in future lost wages, $100,000.00 as future medical expenses, and $200,000.00 in past, present, and future pain and suffering. The total amount that plaintiff is entitled to recover is $446,617.00.

A judgment will be entered in accordance with this opinion.